1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   KENNETH VERNON,

11            Petitioner,                    2: 08 - cv - 1499 - MCE TJB

12        vs.

13   MICHAEL EVANS,

14            Respondent.              ORDER, FINDINGS AND

15                                     RECOMMENDATIONS

16   _____/

17        Petitioner, Kenneth Vernon, is a state prisoner proceeding with a counseled petition for

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving an

19   indeterminate sentence of twenty-five years to life and a determinate sentence of ten years after a

20   jury convicted him on one count of murder in the first degree and found true the allegation that

21   he used a firearm.  Previously, this court granted Respondent's motion to dismiss Petitioner's

22   first, second, and eighth claims for relief raised in his second amended petition as barred by the

23   statute of limitations.  *See* Docket No. 48 (Order Adopting Findings and Recommendations).  As

24   such, Petitioner has eight remaining claims in this federal habeas petition; specifically: (1) Jurors

25   committed misconduct by failing to disclose material information during voir dire ("Claim III");

26   (2) jurors committed misconduct when they had contact and discussions with third parties

                                              1

1   ("Claim IV"); (3) prosecutorial misconduct occurred when the prosecutor communicated with the

2   jury outside of the court proceedings ("Claim V"); (4) Petitioner's right to a public trial was

3   violated when the public was excluded from voir dire proceedings ("Claim VI"); (5) the trial

4   court refused to substitute counsel at Petitioner's retrial after his initial trial resulted in a hung

5   jury ("Claim VII"); (6) if any claims are deemed waived, counsel provided ineffective assistance

6   of counsel ("Claim IX"); (7) there was insufficient evidence from which the jury could find

7   Petitioner guilty of first degree murder ("Claim X"); and, (8) erroneous jury instructions were

8   given regarding consciousness of guilt evidence ("Claim XI").  For the reasons stated herein, the

9   federal habeas petition should be denied.

10                          I.  FACTUAL BACKGROUND[1]

11          Defendant lived at 8201 Arroyo Way in Stockton with his
             girlfriend Robin McClary, her son, and Doyle Dubois.  Defendant
12          worked as a warehouseman from 6 a.m. until 2:30 p.m.  On
             August 24, 1995, he got home at about 3:00 p.m. and took
13          McClary to the doctor for her allergy shot.  Her son was visiting
             his grandparents.
14
             Philip Mosqueda's brother owned 8201 Arroyo Way.  Mosqueda
15          was there that afternoon to fix the sprinklers.  One week earlier he
             had repaired the air conditioning unit and checked the dishwasher.
16          When he told McClary the dishwasher did not work, she was not
             upset.  On August 24, he arrived at 4:45 p.m. and McClary
17          answered the door; defendant came out later.  After 5:00 p.m.
             Mosqueda went to the door and spoke with defendant.  McClary
18          came out; she was not upset and he smelled no alcohol on her
             breath.
19
             Robert Perry worked as a gardener and repairman.  He went to
20          8201 Arroyo Way that day at the owner's request.  When he first
             arrived in the early afternoon, no one was home.  Perry returned a
21          little after 5:00 p.m. and defendant answered the door.  They
             agreed on a price for gardening work and Perry began working; he
22          used an extension cord to the garage for his trimmer and lawn
             mower.
23
             / / /
24

25          [1]          The factual background is taken from the California Court of Appeal, Third
26   Appellate District decision on direct appeal from March 1999 and filed in this Court by
     Respondent on April 6, 2009 as Lodged Doc. No. 2 (hereinafter referred to as the "Slip Op.").

                                          2

Perry saw McClary; she was pleasant and did not smell of intoxicants.  Defendant and McClary went back in the house at 5:30 p.m.  Perry heard the television and stereo very loud.  He heard a plate being broken and glass shattering.  He heard the sound of a firecracker in the distance.  Perry heard heavy walking and the sound of shoes being thrown.  After 20 to 25 minutes in the house, defendant came out carrying clothes and a towel.  As he left, defendant told McClary to turn down the stereo.

Defendant returned in 10 minutes.  His roommate Dubois also arrived, parked, and got in defendant's truck and left.  Dubois got off work at 5:00 p.m. and was usually home by 5:30.  This day he stopped at Kragen Auto Parts, the bank, and Jack-in-the-Box.  He saw defendant on his way home and defendant asked if he wanted to go to the music store.  Dubois went with defendant to Tower Records.  At the store, defendant walked into the door.  Inside defendant claimed he was cut; he had cuts on his arm and leg.  He went to the counter to complain.  The clerk told him he could not have cut himself on the door as there were no sharp edges.  She noticed the blood on his cuts was dried.  Defendant left his name, address, and phone number.  He left angry and came back in 10 to 20 minutes.

Defendant and Dubois returned home.  Defendant spoke briefly with a man who wanted roofing work and went inside.  As they entered the house, Dubois noticed the phone pulled out of the wall in the kitchen and asked defendant about it.  Defendant began calling for McClary.  They found her in the bedroom, face down in blood, with her pants pulled down.  There was a knife by her hand.

Defendant and Dubois left the house, screaming "She's dead."  Defendant went to the neighbor's and pounded on the door, yelling, "Call 911.  My girlfriend's been shot."  He came back and said, "I think she's been raped.  Her panties are down."

A sheriff's deputy got the call about 6:47 p.m.  When the sheriff arrived, Perry was still mowing the lawn and defendant and Dubois were sitting on the grass.  Defendant told the officer his girlfriend was in the house, her face was blue and her tongue hanging out.  She had been shot.

The officer entered the house and noticed the television was loud.  The phone was on the floor in the kitchen.  In the bathroom the window frame was on the floor and the glass was broken.  The screen was bent from the inside and the dirt on the window sill was not disturbed.  In the north bedroom McClary was face down on the floor with her pants pulled below her buttocks.

/ / /

3

In the living room, there were glasses on the floor and blood on the rug. Part of a broken plate was behind the couch. The blood was McClary's. McClary's blood was also found at the door of the bathroom; defendant's blood was in the shower. There was a trail of blood next to the body in the bedroom, indicating it had been moved. The strike plate and door jam to the bedroom door were broken. The waterbed had been knocked off its pedestal. There was a hunting bow and arrows on the floor. A broken gold chain was near the phone and the phone wire was missing. On the corner of the bed was an open purse. There was an empty box for a 9 mm. gun; the gun was never found.

McClary was killed by a gunshot wound to the head. The bullet entered an inch and half behind her left ear, passed through the large muscle in her neck, fractured the base of her skull, and exited behind her right ear. The gunshot was almost level, upwards five degrees. There was a bullet hole in the wall two feet above the floor. The bullet struck the sheetrock horizontally. The gun was fired from about two feet off of the floor.

McClary had several other injuries. There were abrasions and a scrape on her left shoulder blade. She had petechial hemorrhages— dot-like areas of blood—on her eyelids. These could have been caused by pressure to the neck or direct trauma. There were no internal injuries to the neck to indicate strangling. There were petechiae to the mouth area and a contusion on her lower lip. A bruise on her left cheek may have been caused by a ring. McClary had four purple petechial contusions at her Adam's apple and contusions on the right side of her neck. She had a scratch on her chin. There were six contusions on her left hipbone caused by blunt force trauma, bruises below her nipple, and an abrasion to her right elbow. There were no injuries to her hands.

Methamphetamine and ethyl alcohol were found in McClary's blood. Her blood alcohol level was .08; the level of methamphetamine was .13 grams per liter. methamphetamine [sic] is a stimulant that can make one agitated, irritable, paranoid, suspicious, and aggressive. The amount of methamphetamine found in McClary was above the effective level at which there are clinical symptoms, but below the potentially toxic level at which the effects are undesirable.

Defendant was interviewed several times, at first denying any involvement in McClary's death. He suggested other suspects, including a black man who came to the house one week earlier, three Mexicans who tried to break in, and a gang who tried to kill his parents while they were in his car. Defendant also tried to implicate McClary's former boyfriend, Michael King. Late one night he went to King's. King recognized defendant's truck, called 911, and defendant left.

4

Defendant was arrested at McClary's funeral and charged with murder. His first trial resulted in a hung jury. The jurors voted 11 to 1 for murder, with one holding out for manslaughter. The prosecution offered defendant second degree murder with the low term for the use allegation, for a total prison term of 18 years to life.

On retrial, defendant admitted he shot McClary, but claimed it was manslaughter. Defendant testified when he moved into 8201 Arroyo Way, the sprinklers, air conditioning, and dishwasher did not work. The landlord got upset that the lawn was dying and sent a three-day notice. The landlord told him if he hired a gardener, he could forget the notice. The landlord fixed the air conditioning. The dishwasher could not be fixed but the landlord would buy a new one in October.

Defendant had purchased a gun in March. McClary kept it in her purse. McClary noted their arguments on a calendar. Defendant described them as "Just kind of a huff and puff and ignore."

On August 24, McClary was fixing dinner and drinking wine. She had two glasses of wine. She complained about the landlord not fixing things. She got angrier and said she would call him. Defendant told her not to; he had taken care of it. McClary brushed past him saying "fuck you" and stormed into the bedroom, slamming the door. Defendant got mad and told her not to slam the door; she slammed it again.

McClary went to the living room and sat on the couch. Defendant followed and yelled in her face. She pushed him and he pushed her harder, cussing. She threw a plate at him which broke on his arm. He pushed her down on the couch and saw blood on her hand. She stormed to the bedroom, yelling. Defendant followed, telling her to calm down. She tried to hit him and he pushed her into the shower. Defendant was bleeding from his arm.

Defendant backed up and McClary tackled him on the bed, causing it to collapse. She hit defendant and he hit her in the face. He threw her off the bed and she landed near the wall. She grabbed an arrow and struck him in the leg. He grabbed the arrow and jerked it from her. McClary was screaming that she would kill him. He turned and saw she had a gun. He tackled her and they struggled on the ground over the gun. He pulled away and fired. She fell on top of him.

He thought no one would believe what happened so he came up with the idea to make it look like someone broke in. He opened the sliding glass door, kicked in the bedroom door, took out the bathroom window, and pushed the screen out. He threw the broken plate in the trash, grabbed a knife and put blood on it, and pulled down McClary's pants.

5

He intercepted Dubois and ran into the door at Tower records to explain his cuts.  He threw the gun in the dumpster at Payless and towels in the dumpster at Burger King.  FN1 Defendant admitted he had lied.  He was scared and in denial.

> FN1.  Defendant had told the police he cleaned up at Burger king.  When they checked the dumpsters the next day, the one behind Payless had already been emptied.  They found bloody towels in the dumpster at Burger King.  Both defendant's and McClary's blood was on the towels.

On cross-examination, the prosecutor asked defendant if he intended to shoot McClary.  Defendant answered repeatedly only that he pulled the trigger.  Finally, defendant admitted he meant to shoot her in the head.  In the previous trial, he had testified he intended to kill her.  The prosecutor then asked what defendant was thinking while they were wrestling for the gun.

"Q.  Okay.  Do you remember again testifying on cross-examination – counsel, page 1214 – in the last trial:

"All I remember when we were wrestling with the gun, uh, at a certain time in my head right before I had pulled the gun away from her I was like, 'I've got to shoot.'  I pulled the gun away and I just shot with, uh, no time to think or nothing.  Just happened quick, real quick.

"A.  Yes.

"Q.  So you thought about it for at least a moment before you got the gun away, about 'I have to shoot her?'

"A.  Yes, right – right when I had got somewhere through there."

The prosecutor argued it was a deliberate, premeditated murder.  Defendant turned up the television to hide the noise and pulled the phone out when McClary tried to call for help.  He kicked the bedroom door in during the fight.  The violence escalated with every encounter.  Three times McClary walked away from defendant; each time he followed and continued the fight.  The prosecutor argued defendant's deliberate acts after the killing showed he acted with cool, rational thought, not out of heat of passion.  In rebuttal, the prosecutor reminded the jury defendant said he was going to kill her before he had the gun.

During deliberations, the jury asked for a rereading of defendant's testimony on cross-examination about whether he intended to kill McClary.  It then asked for the portion of defendant's testimony where he discussed wrestling the gun from her.  "We believe he said to himself that he knew he had to kill her."  After this

6

1    testimony was read, the jury returned a first degree murder
2    verdict.

3                            II. PROCEDURAL HISTORY

4          On April 4, 1997, Petitioner was sentenced to a total term of thirty-five years to life in

5    prison in California Superior Court for the County of San Joaquin after a jury found Petitioner

6    guilty on one count of first degree murder with an enhancement for the use of a firearm.  Rep.'s

7    Tr. (Second Trial) [hereinafter "RT2"] at 1683; *see also* Pet'r's Second Am. Pet. [hereinafter

8    "Pet."] at ¶ 1; Lodged Doc. No. 1 (Abstract of Judgment).  Petitioner appealed his conviction to

9    the California Court of Appeal, Third Appellate District.  On direct appeal, Petitioner claimed

10   that there was insufficient evidence to support a verdict of first degree murder (Claim X in the

11   present petition) and raised challenges to the instructions given to the jury before deliberation

12   (Claim XI in the present petition).  On March 8, 1999, the Court of Appeal, in a reasoned

13   decision, affirmed Petitioner's conviction and sentence.  Slip Op. at 2.  The California Supreme

14   Court denied discretionary review.  Lodged Doc. No. 4 (California Supreme Court Denial Order).

15         On September 11, 2000, Petitioner filed a state habeas petition in San Joaquin County

16   Superior Court.  Lodged Doc. No. 5 (Petition for Writ of Habeas Corpus, San Joaquin County

17   Superior Court) [hereinafter "State Habeas Pet."].  In that petition, Petitioner raised the

18   remaining claims for relief that he asserts in this court.  *Id.*  The following day, Petitioner filed

19   the instant federal petition for habeas corpus in United States District Court for the Northern

20   District of California.  *See* Pet'r's Pet. for Writ of Habeas Corpus, Docket No. 1.  Noting that

21   Petitioner had a pending petition for habeas corpus in state court, and without requiring the

22   Respondent to be noticed, the district court dismissed Petitioner's petition without prejudice to

23   Petitioner filing a new petition after all of his state court post-conviction proceedings had

24   concluded.  *See* Docket No. 2 (Order Dismissing Petition).  Petitioner then filed a first amended

25   petition, which the court did not respond to, and on October 24, 2007, over seven years after

26   originally filing his petition, Petitioner moved the district court to allow him to file a second

                                               7

amended petition and to hold the proceedings in abeyance until he had exhausted all of his claims

in state court.  *See* Docket No. 17.  The district court granted Petitioner's motion, Docket No. 18,

and Petitioner filed his second amended petition in the Northern District on March 4, 2008.  *See*

Pet.

Meanwhile, Petitioner's state petition proceeded through the state courts.  On October 1,

2001, the Superior Court, in a reasoned decision, denied Petitioner's petition.  Lodged Doc. No.

6 [hereinafter "State Habeas Op."], at 3.  After the Superior Court's denial, Petitioner filed

petitions with the California Court of Appeal and then the California Supreme Court.  *See*

Lodged Doc. Nos. 7 & 9.  Both courts summarily denied the petitions, the Supreme Court doing

so on April 9, 2003.  Lodged Doc. Nos. 8 & 10.  Later that month, Petitioner moved the federal

court to reopen his case.  *See* Docket No. 22.  The court granted the motion and ordered

Respondent to respond to the petition by answer or motion to dismiss.  Docket No. 23.

Thereafter, Respondent moved to have the case transferred here, to the Eastern District of

California, the district of conviction.  Petitioner did not oppose the motion, and the court ordered

that the case be transferred.

Upon arrival in this court, Respondent moved to dismiss claims one, two, and eight of the

second amended petition.  Docket No. 34 (Motion to Dismiss).  Finding those claims barred by

AEDPA's one-year statute of limitations, the court granted the motion, dismissed those claims,

and ordered Respondent to respond to the remaining claims in Petitioner's second amended

petition by answer.  *See* Docket Nos. 45 & 48 (Findings and Recommendations & Order

Adopting Findings and Recommendations).

## III.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state

court can only be granted for violations of the Constitution or laws of the United States.  *See* 28

U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

*Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

1   Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

2   and Effective Death Penalty Act of 1996 ("AEDPA") applies.  *See Lindh v. Murphy*, 521 U.S.

3   320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

4   decided on the merits in the state court proceedings unless the state court's adjudication of the

5   claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

6   clearly established federal law, as determined by the Supreme Court of the United States; or (2)

7   resulted in a decision that was based on an unreasonable determination of the facts in light of the

8   evidence presented in state court.  *See* 28 U.S.C. § 2254(d); *Perry v. Johnson*, 532 U.S. 782, 792-

9   93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000).

10          In applying AEDPA's standards, the federal court must "identify the state court decision

11  that is appropriate for our review."  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

12  "The relevant state court determination for purposes of AEDPA review is the last reasoned state

13  court decision."  *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted).

14  "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained

15  orders upholding that judgment or rejecting same claim rest upon the same ground."  *Ylst v.*

16  *Nunnemaker*, 501 U.S. 797, 803 (1991).  To the extent no such reasoned opinion exists, courts

17  must conduct an independent review of the record to determine whether the state court clearly

18  erred in its application of controlling federal law, and whether the state court's decision was

19  objectively unreasonable.  *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). "The

20  question under AEDPA is not whether a federal court believes the state court's determination

21  was incorrect but whether that determination was unreasonable—a substantially higher

22  threshold."  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

23  "When it is clear, however, that the state court has not decided an issue, we review that question

24  *de novo*."  *Reynoso v.Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*,

25  545 U.S. 374, 377 (2005)).

26

## IV.  REQUESTS FOR AN EVIDENTIARY HEARING AND DISCOVERY

Petitioner requests an evidentiary hearing and additional discovery on his claims.  *See* Pet. at 29.  A court presented with a request for an evidentiary hearing must first determine whether a factual basis exists in the record to support petitioner's claims, and if not, whether an evidentiary hearing "might be appropriate."  *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999); *see also Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005).  A petitioner requesting an evidentiary hearing must also demonstrate that he has presented a "colorable claim for relief." *Earp*, 431 F.3d at 1167 (citations omitted).  To show that a claim is "colorable," a petitioner is "required to allege specific facts which, if true, would entitle him to relief."  *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998) (internal quotation marks and citation omitted).  Moreover, the Supreme Court has recently held that federal habeas review under 28 U.S.C. § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits" and "that evidence introduced in federal court has no bearing on" such review.  *Cullen v. Pinholster*, __ U.S. __, 131 S.Ct. 1388, 1398, 1400 (2011).

Petitioner has not alleged any additional facts that, if true, would entitle him to relief.  In several of Petitioner's claims, he simply purports that prejudice resulted without alleging any specific facts to support such a finding or showing how the alleged deficiencies might have altered the result of his trial.  *See Ortiz*, 149 F.3d at 934.  Petitioner must allege facts, and not list mere conclusions, in support of his petition.  *See* Rule 2(c)(2), Rules Governing § 2254 Cases.  As such, Petitioner fails to demonstrate that he has any colorable claim for federal habeas relief.  Furthermore, each and every one of Petitioner's claims was decided on the merits in state court, either on direct appeal or in state habeas proceedings.  As such, § 2254(d) applies to Petitioner's claims and this court, in reviewing those claims, is limited to the record that was before the state court.  *Pinholster*, 131 S.Ct. at 1398.  Thus, his requests for an evidentiary hearing and further discovery will be denied.

/ / /

## V.  ANALYSIS OF PETITIONER'S CLAIMS

### 1. Claim III

In Claim III, Petitioner alleges that jurors at his trial committed misconduct when they failed to disclose certain material information during voir dire.  Petitioner alleges that: (1) One juror failed to disclose that she was related to one of the prosecution's key witnesses; (2) another juror failed to disclose that he "knew or was acquainted with" Petitioner's uncle; and, (3) a third juror was familiar with the scientific evidence involved in the trial which he did not disclose in voir dire.  Furthermore, Petitioner alleges that a note the third juror sent to the trial judge regarding the evidence shows that the juror was biased.

Petitioner did not raise this claim on direct appeal.  He did, however, raise this claim in state habeas proceedings.  *See* State Habeas Pet. at 3-6.  The reasoned decision by the San Joaquin Superior Court represents the last reasoned decision on this claim.  *Ylst*, 501 U.S. at 803.  In ruling on Petitioner's claim, the Superior Court concluded as follows:

Three incidents are raised with regard to this ground.

The first incident involves juror, Linda Withers.  Petitioner asserts that she is related to a key prosecution witness by marriage and her family knows petitioner's family.  The petition states that those relationships were not disclosed during voir dire.  A review of the trial transcript, however, indicates that during the trial, counsel for petitioner was advised by petitioner's mother that the Withers family and the Vernon family know each other.  Counsel advised the court of that fact.  The court examined petitioner's mother and examined Ms. Withers.  The court found that the juror did not know petitioner or the witnesses and allowed Ms. Withers to remain on the jury.

The second incident involves an unknown juror who purportedly "dropped something just in front of [petitioner's father.] As the man was bending down to pick up the object, he turned to [petitioner's father] and asked if [he] was the brother of Jack Vernon."  Declaration of William Vernon.  When Petitioner's father said yes, the juror responded by saying, "Oh. Good."  This evidence is vague and speculative as to what could be implied.  (*In re Swain* (1949) 34 C.2d 300, 303-304.)

The third incident occurred in the jury deliberation room when a juror wrote a note to the court indicating that he understood that

11

1    the use of allergy or asthma medication may give a false positive in
     blood testing for amphetamine use.

2
     A review of the entire record reveals that petitioner admitted to
3    shooting the deceased, Robin McClary.  The issue for the jury was
     to determine petitioner's state of mind at the time of the shooting.
4    The record shows that the jury focused upon petitioner's own
     testimony about his thoughts during the struggle for the gun, just
5    prior to the shooting.  With that evidence, the jury decided that
     petitioner shot Ms. McClary with the intent to kill her.  Thus, when
6    looking at the record as a whole, there is no showing that the
     juror's statements about whether Robin McClary had ingested
7    amphetamines or allergy medicine may have influenced the jury's
     verdict.

8

9    State Habeas Op. at 1-2 (alterations in original).

10        "[I]mpartial jurors are the cornerstone of our system of justice and central to the Sixth

11   Amendment's promise of a fair trial."  *United States v. Dutkel*, 192 F.3d 893 (9th Cir. 1999).

12   However, "due process does not require a new trial every time a juror has been placed in a

13   potentially compromising situation. Were that the rule, few trials would be constitutionally

14   acceptable."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  "[I]t is virtually impossible to shield

15   jurors from every contact or influence that might theoretically affect their vote.  Due process

16   means a jury capable and willing to decide the case solely on the evidence before it, and a trial

17   judge ever watchful to prevent prejudicial occurrences and to determine the effect of such

18   occurrences when they happen."  *Id.*  "[T]he remedy for allegations of juror partiality is a hearing

19   in which the defendant has the opportunity to prove actual bias."  *Id.* at 215; *see Remmer v.*

20   *United States*, 347 U.S. 227 (1954); *Dennis v. United States*, 339 U.S. 162 (1950); *Chandler v.*

21   *Florida*, 449 U.S. 560 (1981); *see also United States v. English*, 92 F.3d 909 (9th Cir. 1996) ("To

22   obtain a new trial, the defendant must establish that actual prejudice resulted from an ex parte

23   contact with a juror." (citing *United States v. Madrid*, 842 F.2d 1090, 1093 (9th Cir. 1988), *cert.*

24   *denied*, 488 U.S. 912 (1988))).  When such a hearing is held, the state court's findings are

25   entitled to a presumption of correctness on federal habeas corpus review.  28 U.S.C. § 2254(d);

26   *see Thompson v. Keohane*, 516 U.S. 99, 111 (1995); *Tinsley v. Borg*, 895 F.2d 520, 524-25 (9th

                                                        12

1  Cir. 1990).

2       As to the first juror, Mrs. Withers, who was allegedly related to one of the prosecution's

3  key witnesses, Petitioner's counsel made the trial court aware of such allegation.  RT2 at 271.

4  Thereafter, the trial court, out of the presence of the jury, questioned Ernestine Vernon,

5  Petitioner's mother, about the alleged relationship between Withers and the prosecution's

6  witness.  *Id.* at 273-74.  Vernon testified that the Withers family had grown up with the witness's

7  family, but admitted that it was later that Withers had married into the family.  *Id.*  Vernon

8  recognized Withers from the community, but could not recall exactly where from.  *Id.* at 274.

9  Later, out of the presence of the rest of the jurors, the judge questioned Withers.  *Id.* at 284.

10  Withers testified that throughout the course of the trial to that point she had not come to realize

11  that she was acquainted with any witness.  *Id.*  Withers further testified that while she was

12  married, Withers was her maiden name which she retained after marriage.  *Id.* at 284-85.

13  Contradicting Vernon's testimony, Withers testified that she lived in Lodi, not Stockton.  *Id.*  The

14  court did not remove Withers from the jury.

15       Petitioner was afforded the process which the Supreme Court has required.  *See Phillips*,

16  455 U.S. at 217.  After Petitioner raised his claim of juror bias, the trial court questioned the

17  juror and determined that no bias existed.  The trial court's determination of the facts is entitled

18  to a presumption of correctness.  *Tinsley*, 895 F.2d at 524-25.  Withers, who had no idea for what

19  purpose she was being examined, testified that she was not a member of the Withers family

20  which Vernon thought she was.  As such, the Superior Court reached a reasonable conclusion

21  when it denied Petitioner's petition for habeas corpus on this ground.

22       As to Petitioner's second and third claims of juror bias, petitioner fails to allege that the

23  purported transgressions led to any actual bias or prejudice against Petitioner.  Contrary to

24  Petitioner's assertion, prejudice is not presumed unless the subject of the contact was in regard to

25  the matter pending before the jury and deliberate coercion was intended.  *See Remmer*, 347 U.S.

26  at 227; *Madrid*, 842 F.2d at 1093 (*Phillips*, 455 U.S. 209, and *Rushen v. Spain*, 464 U.S. 114

1    (1983) (per curiam), "firmly establish that a defendant must demonstrate 'actual prejudice'

2    resulting from an ex parte contact to receive a new trial.").  Even if the second juror did know

3    Petitioner's family or the third juror had superior knowledge regarding the scientific evidence,

4    Petitioner fails to show how this led to bias in the jury or related to the jury's task: determining

5    whether Petitioner's admitted acts amounted to murder or manslaughter.  Without more,

6    Petitioner has not met his burden of establishing prejudice in the jurors' conduct and he is not

7    entitled to relief on this claim.  The Superior Court reached a reasonable conclusion when it

8    denied Petitioner's claim on this basis.

9        2.  Claim IV

10        In Claim IV, Petitioner asserts juror misconduct, alleging that the jurors had contact with

11    the prosecutor and the victim's family throughout the course of the trial.  As with Claim III, the

12    last reasoned decision on this claim is the Superior Court's ruling on Petitioner's state habeas

13    petition.  In determining the merits of Petitioner's claim and denying the petition, the Superior

14    Court stated as follows:

15            The evidence presented in support of this writ indicates that the
              conversations at issue were "very friendly conversation with

16            various members of the jury, during the recesses and breaks. . . .
              [T]he jurors and [the district attorney would] be laughing and

17            smiling during these exchanges."  The conversations were
              described as "friendly and jovial."  *See* Declaration of William

18            Vernon.

19            There is no evidence of any sort as to the substance of the
              conversations or the length of the conversations.

20

21    State Habeas Op. at 2 (alterations in original).

22        Like Claim III, Petitioner fails to allege more than superficially that any actual bias or

23    prejudice resulted from the alleged conversations between the jury, the victim's family, and the

24    prosecutor.  While Petitioner's claims were not presented to the trial court, Petitioner was given a

25    fair opportunity to raise his claims of bias in his state habeas petition.  *See Phillips*, 455 U.S. at

26    215.  The Superior Court concluded Petitioner failed to make such a showing and its

14

1  determination of the facts is entitled to deference so long as the determination is reasonable.  28

2  U.S.C. § 2254(d)(2).  Here, based on the information available to the Superior Court, it reached a

3  reasonable determination when it concluded Petitioner failed to show any actual bias or prejudice

4  as a result of the alleged interactions.  A careful review of the declarations submitted in state

5  court by Petitioner's family and a family friend show that while they allege that conversations

6  between the jurors, the prosecutor, and the victim's family occurred, they do not allege any of the

7  content of these conversations or that they were related to Petitioner's case in any way.  *See* State

8  Habeas Pet., Exs. A, B, & C.  The fact that the interactions occurred, by itself, does not entitle

9  Petitioner to relief unless he can show that bias or prejudice existed.  *Madrid*, 842 F.2d at 1093.

10 Petitioner is not entitled to relief on this claim.

11     3.  Claim V

12     In Claim V, Petitioner alleges the same facts as claim IV, but rather than arguing that the

13 ex parte communications led to juror bias, claims that the prosecution's involvement in the ex

14 parte communications amounted to prosecutorial misconduct.  In ruling on this claim, the

15 Superior Court stated:

16         The basis for this ground is the same as discussed above; that is,
            the district attorney engaged in three-way conversations with jurors
17          and the victim's family in the courtroom during breaks and the
            district attorney accepted food offered by a juror.
18
            There is no evidence of any sort as to the substance of the
19          conversations or interaction.

20 State Habeas Op. at 2.

21     Like Claim IV, the Superior Court reached a reasonable determination in denying Claim

22 V because Petitioner failed to demonstrate any facts from which it could be concluded that these

23 conversations resulted in prejudice.  "The touchstone of due process analysis in cases of alleged

24 prosecutorial misconduct is the fairness of the trial."  *Smith*, 455 U.S. at 219 (citing *Brady v.*

25 *Maryland*, 373 U.S. 83 (1963)).  Thus, in order to merit relief, a petitioner must show not only

26 that the prosecutor acted in a manner inconsistent with that position, but that such actions had a

1  prejudicial effect on the petitioner's trial.  *Id.* at 220.  "To constitute a due process violation, the

2  prosecutorial misconduct must be 'of sufficient significance to result in the denial of the

3  defendant's right to a fair trial.'"  *Greer v. Miller*, 483 U.S. 756, 765 (quoting *United States v.*

4  *Bagley*, 473 U. S. 667, 676 (1985)) (other citations omitted).

5       Petitioner was given an opportunity, through state court collateral proceedings, to show

6  that prejudice resulted from the prosecutor's actions.  The state court concluded Petitioner had

7  failed to even allege, much less prove, facts which would indicate that the prosecutor's actions in

8  this case led his trial to be fundamentally unfair.  A careful review of the record available to the

9  Superior Court shows that Petitioner failed to show prejudice.  As such, Petitioner is not entitled

10  to relief on this claim.

11       4.  Claim VI

12       In Claim VI, Petitioner alleges that he was denied his right to a public trial guaranteed by

13  the Sixth Amendment.  In support of this claim in state court, Petitioner presented the declaration

14  of his mother, Ernestine Vernon.  *See* Lodged Doc. No. 5 (State Court Petition), Ex. A.  In her

15  declaration, Vernon states:

16              At the beginning of the second trial, I was informed by
             [Petitioner's counsel] that I could not be in the courtroom during
17              the process where the jury was picked.  [Petitioner's counsel] told
             us that there wasn't enough room for me to be there.  After the jury
18              was picked, we returned to the courtroom.

19  *Id.* at ¶ 9.  This represents the extent of Petitioner's factual allegations with regard to Claim VI.

20  In ruling on this claim, the Superior Court found as follows:

21              By way of the Declaration of Ernestine Vernon, petitioner asserts
             that his mother was informed by petitioner's counsel that she could
22              not be in courtroom [sic] during voir dire because there was not
             enough room in the courtroom.  After the jury was picked, she
23              returned to the courtroom.

24              There is no evidence to suggest that the trial court closed voir dire
             to the public or even that the *trial court* excluded petitioner's
25              mother from voir dire.

26  State Habeas Op. at 2 (emphasis in original).

                                         16

1    The right to a public trial in criminal cases extends to the jury selection phase of trial.

2  *Press-Enterprise Co. v. Superior Court of Cal., Riverside Cty.*, 464 U.S. 501 (1984) (*Press-*

3  *Enterprise I*) (holding that the first amendment guarantees the public access to voir dire

4  proceedings); *see also Presley v. Georgia*, __ U.S. __, 130 S.Ct. 721, 722, 724 (2010) (decided

5  after Petitioner's trial in this case but concluding that the Supreme Court's "clear precedents"

6  establish that the Sixth Amendment right to a public trial extends to the voir dire of prospective

7  jurors); *Waller v. Georgia*, 467 U.S. 39 (1984) (relying on *Press-Enterprise I* in ruling that a

8  pretrial suppression hearing must be open to the public).  While the accused does have a right to

9  insist that the voir dire of the jurors be public, there are exceptions to this general rule.  "[T]he

10  right to an open trial may give way in certain cases to other rights or interests, such as the

11  defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive

12  information."  *Waller*, 467 U.S. at 45.  "Such circumstances will be rare, however, and the

13  balance of interests must be struck with special care."  *Id.*  "[T]he party seeking to close the

14  hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no

15  broader than necessary to protect that interest, the trial court must consider reasonable

16  alternatives to closing the proceeding, and it must make findings adequate to support the

17  closure."  *Id.* at 48.

18    Petitioner's claim fails because he does not allege that the trial court closed the

19  proceedings to the public.  In preparing for voir dire at Petitioner's retrial, the trial judge stated

20  "[w]e'll have 100 jurors in here.  It will be standing room only."  RT2 at 30-31.  This indicates

21  that the courtroom would be crowded and that there would be limited room for spectators.  It

22  does not, however, indicate that the judge was closing the voir dire proceedings to the public.

23  The fact that Petitioner's mother was excluded from the courtroom, by Petitioner's counsel, not

24  the judge, does not show that the public was prevented from attending the voir dire proceedings.

25  Petitioner does not allege that all members of the public, and not just his mother, were precluded

26  from being in the courtroom.  By their nature, courtrooms are rooms of limited space.  In trials

popular among the public, there may not be room for every member of the public who wishes to attend the trial.  This does not mean that the defendant's right to a public trial is violated, so long as members of the public are permitted to attend all aspects of the trial.  The Superior Court reasonably concluded that the evidence did not show the trial court excluded the public from voir dire proceedings, or even that it was the trial court that excluded Petitioner's mother.  As such, Petitioner is not entitled to relief on this claim.

   5. Claim VII

   In Claim VII, Petitioner asserts that his constitutional rights were violated when the trial court refused to substitute counsel for Petitioner's retrial after his initial trial ended in a mistrial when the jury deadlocked on the murder charge.  Petitioner also alleges that, as a result of counsel not being substituted, his counsel provided ineffective assistance of counsel at his retrial. As with Petitioner's previous claims, the last reasoned decision by the state courts as to this claim is the ruling of the Superior Court on state habeas review:

> *Petitioner deprived of right to effective assistance of counsel.*
>
> There are two grounds upon which this argument is made.  First, petitioner asserts that the trial court refused to substitute counsel for the second trial (after a mistrial occurred in the first trial when the jury was unable to reach a verdict).  Second, petitioner states that defense counsel, appointed over his objection, provided ineffective assistance of counsel.
>
> In order to prevail on his claim of ineffectiveness of counsel, petitioner must establish the performance of counsel was both deficient and caused him prejudice (*Strickland v. Washington* (1984[)] 466 U.S. 688; *People v. Pope* (1979) 23 C3d 412). Prejudice is shown where there is reasonable probability that, but for counsel's performance or lack thereof, the result of the proceedings would have been different.  (*People v. Lucas* (1995) 12 C.4th 415, 436.)
>
> The record reflects that after the jury in the first trial was unable to reach a verdict, defense counsel, Ralph Cingcon, asked to be relieved as counsel for the second trial because petitioner had no funds to retain him.  The trial court expressed its opinion that "there was no attorney better prepared to proceed at this time" and appointed Mr. Cingcon as attorney of record, over Mr. Cingcon's objection.  Mr. Cingcon represented petitioner for the duration of

the second trial.

Petitioner states that during the second trial, defense counsel failed to adequately investigate ballistics testing and failed to consult with forensic experts. Petitioner continues that defense counsel improperly excluded petitioner's mother from the voir dire process, failed to adequately question prospective jurors, failed to review petitioner's presentence report prior to sentencing and failed to preserve trial files. FN1 This, petitioner asserts, constitutes ineffective assistance of counsel.

> FN1. According to the petition, writ counsel has communicated with defense counsel in an effort to obtain the trial files. It appears that the files may have been destroyed or discarded. There was a flood due to a water pipe break which is believed to have damaged the files. One box of files was located and turned over to writ counsel.

As stated above, the record reflects that at the second trial, petitioner admitted that he shot Robin McClary, but claimed that it was manslaughter, rather than murder. The issue was petitioner's state of mind at the time of the shooting. The jury had a portion of petitioner's testimony reread while deliberating. The jury concluded that petitioner shot with the intent to kill.

Petitioner offers nothing in the way of evidence to suggest how the claimed deficiencies affected the verdict of the outcome of the trial.

State Habeas Op. at 2-3.

### a. Denial of Request to Substitute Counsel

The Sixth Amendment to the Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. "Lawyers in criminal cases 'are necessities, not luxuries.'" *United States v. Cronic*, 466 U.S. 648, 654 (1984) (quoting *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963)) (footnote omitted). The right to counsel was designed to assure fairness in the adversary criminal process. *United States v. Morrison*, 449 U.S. 361, 364 (1981); *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (the purpose of providing assistance of counsel "is simply to ensure that criminal defendants receive a fair trial"); *see also Wheat v. United States*, 486 U.S. 153, 158-59 (1988). The "essential aim of the Amendment is to guarantee and effective advocate for each

criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer who he prefers." *Wheat*, 486 U.S. at 159 (citing *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983); *Jones v. Barnes*, 463 U.S. 745 (1983)); *see Cronic*, 466 U.S. at 657, n. 21 ("the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such").  Thus, the Sixth Amendment does not guarantee a meaningful relationship between attorney and client, but rather focuses on the attorney's ability to adequately assist the defendant in his defense.  *See Slappy*, 461 U.S. at 14.

After Petitioner's trial ended in a mistrial, Petitioner's retained counsel, Mr. Cingcon, attempted to withdraw from the case for numerous reasons.  Rep.'s Tr. (First Trial) [hereinafter "RT1"] at 1635-41.  Cingcon believed a new attorney would be able to provide a new, thorough, and open minded review of the evidence and that, in general, defense attorneys who retry cases tend to "go[] through the motions."  *Id.* at 1636.  He also noted that he had several other trials to attend to and indicated that Petitioner could no longer afford his services.  *Id.* at 1640.  After concluding that Petitioner was indigent and that Cingcon was in the best position to retry the case, the court appointed Cingcon as Petitioner's counsel for his retrial, to be paid by the state. *Id.* at 1643.  Petitioner has not alleged that he and Cingcon had such a conflict that it resulted in a total lack of communication preventing an adequate defense.  *See United States v. Schaff*, 948 F.2d 501 (9th Cir. 1991); *United States v. McClendon*, 782 F.2d 785, 789 (9th Cir. 1986).   As such, the refusal of the trial court to substitute a new attorney in place of Cingcon before Petitioner's retrial did not, *per se*, violate the Sixth Amendment guarantee of effective assistance of counsel.

### b.  Ineffectiveness of Counsel

Even if failing to substitute defense attorneys did not violate Petitioner's Sixth Amendment right to counsel, Petitioner alleges that Cingcon's performance at his retrial amounted to ineffective assistance of counsel.  The Sixth Amendment guarantees effective assistance of counsel.  In *Strickland v. Washington*, *supra*, the Supreme Court articulated the test

for demonstrating ineffective assistance of counsel.  First, the petitioner must show that considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  *See Strickland*, 466 U.S. at 688.  Petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  *See id.* at 690.  The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the range of professional competent assistance.  *See id.*

Second, a petitioner must affirmatively prove prejudice.  *See id.* at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is "a probability sufficient to undermine the confidence in the outcome."  *Id.*  A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by defendant as a result of the alleged deficiencies . . . [i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."  *Pizzuto v. Arave*, 280 F.3d 949, 955 (9th Cir. 2002) (citing *Strickland*, 466 U.S. at 697).  When analyzing a claim for ineffective assistance of counsel where a state court has issued a decision on the merits, a habeas court's ability to grant the writ is limited by two "highly deferential" standards.  *Premo v. Moore*, __ U.S. __, 131 S.Ct. 733, 740 (2011).  "When § 2254(d) applies," as it does here, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*

The Superior Court was reasonable when it concluded that Petitioner did not establish that he was prejudiced by any of counsel's purported deficiencies and, therefore, that his right to effective assistance of counsel was not violated.  First, Petitioner alleges that trial counsel was deficient for failing to make further investigation regarding the crime; specifically, failing to perform ballistics testing and failure to consult forensic experts.  Petitioner cannot show he was prejudiced by such purported failures.  At trial, Petitioner admitted to shooting the victim.  *See*

21

RT2 at 978-81.  The only question for the members of the jury was whether Petitioner's actions

amounted to murder or manslaughter based on their conclusion regarding Petitioner's state of

mind at the time he pulled the trigger.  Petitioner does not dispute this.  Pet. at ¶ 68.  As such, any

evidence regarding ballistics or forensics was irrelevant to the ultimate question presented to the

jury and Petitioner suffered no prejudice as a result of counsel's alleged deficiencies.

Second, Petitioner alleges counsel was ineffective by allowing Mrs. Withers to be placed

on the jury and, once becoming aware she was allegedly related to one of the prosecution's

witnesses, failing to adequately question her and failing to object to the trial court's ruling that

she would remain on the jury.  As discussed above in Claim III, the court reasonably concluded

that no prejudice resulted from Withers' participation on the jury because the trial court

conducted a hearing and determined that she was not bias.  *See Phillips*, 455 U.S. at 215.

Petitioner does not show facts that would prove Withers was bias and, therefore, he cannot show

that he was prejudiced as a result of his counsel's actions with regard to her participation on the

jury.

Third, Petitioner asserts his counsel was ineffective for allowing voir dire to be closed to

the public or, in the alternative, preventing Petitioner's mother from attending the voir dire

proceedings.  As discussed above, Petitioner has offered no evidence that the voir dire

proceedings were closed to the public.  Furthermore, Petitioner fails to show how his mother

being present during the voir dire proceedings would have changed the outcome of his trial.

Petitioner alleges that had his mother been present, she would have been able to identify Mrs.

Withers as a biased juror sooner, but the trial court eventually concluded Mrs. Withers was not,

in fact, bias.  It was reasonable for the Superior Court to conclude Petitioner was not prejudiced

by counsel's actions during voir dire.

Finally, Petitioner argues that his trial counsel was deficient for failing to review the

presentence report, failing to accept a recess offered by the court to review the presentence

report, and failing to preserve trial files.  As with Petitioner's other contentions, these claims fail

1  because Petitioner does not show that he was prejudiced a as result of the purported errors.

2  Petitioner makes no showing that had the presentence report been thoroughly reviewed, the

3  resulting sentence would have been different.  Indeed, he fails to make more than a bare

4  allegation that he suffered prejudice.  *See* Pet. at ¶ 58.  With regard to the failure to preserve trial

5  files, Petitioner does not make any allegations as to how this prejudiced him in any way from

6  pursuing his appeals or attempts at collateral relief.

7          For the foregoing reasons, Petitioner is not entitled to relief on this claim.

8          6. Claim IX

9          In Claim IX, Petitioner argues that if any of his claims are deemed waived that it was the

10  result of ineffective assistance of counsel.  None of Petitioner's claims were deemed waived or

11  procedurally bared in state court and at least one state court reached the merits of each and every

12  one of Petitioner's claims.  In Petitioner's reply to Respondent's answer to his petition, he argues

13  that this claim applies to his claims— Claims I, II, and VIII— which were dismissed by this court

14  for failure to file within AEDPA's one year statute of limitations.  *See* Pet'r's Am. Reply, Docket

15  No. 66, at 39; Docket No. 45 (Findings and Recommendations recommending dismissal of

16  Claims I, II, and VIII); Docket No. 48 (Order by district court adopting Findings and

17  Recommendations in full).

18          Petitioner's claim is without merit as he has no right to an attorney, much less the

19  effective assistance of an attorney, in proceedings for collateral relief.  *Pennsylvania v. Finley*,

20  481 U.S. 551, 555 (1987); *Murray v. Giarratano*, 492 U.S. 1 (1989) (applying the rule to capital

21  cases); *see also Martinez v. Schriro*, 623 F.3d 731 (9th Cir. 2010).  A habeas corpus proceeding

22  is "not part of the criminal proceeding itself, and it is in fact considered to be civil in nature."

23  *Finley*, 481 U.S. at 557 (citing *Fay v. Noia*, 372 U.S. 391, 423-24 (1963)).  As such, the failure to

24  file a federal habeas petition within AEDPA's limitations period does not implicate Petitioner's

25  Sixth Amendment right to the effective assistance of counsel.  *Cf. Coleman v. Thompson*, 501

26  U.S. 722, 754 (1991) (a petitioner cannot claim constitutionally ineffective assistance of counsel

1   in state post-conviction proceedings) (citing *Wainwright v. Torna*, 455 U.S. 586 (1982) (where

2   there is no constitutional right to counsel there can be no deprivation of effective assistance)).

3          7.  Claim X

4          In Claim X, Petitioner argues that the evidence adduced at his retrial was insufficient to

5   convict him of murder in the first degree.  As noted previously, there is no question that

6   Petitioner shot the victim.  The question before the jury was whether Petitioner's acts, based on

7   his state of mind at the time, amounted to murder or manslaughter and, if murder, in which

8   degree.  *See* Pet. at ¶ 68.  Unlike Petitioner's previous claims, the last state court to produce a

9   reasoned decision on this claim was the California Court of Appeal on Petitioner's direct appeal

10  from his conviction.  In ruling on Petitioner's insufficiency of the evidence claim, that court

11  determined as follows:

12         Defendant contends there is insufficient evidence of first degree
        murder.  Specifically, he contends there is insufficient evidence to
13      show premeditation and deliberation.

14         "In determining whether a reasonable trier of fact could have found
        defendant guilty beyond a reasonable doubt, the appellate court
15      'must view the evidence in a light most favorable to respondent
        and presume in support of the judgment the existence of every fact
16      the trier could reasonably deduce from the evidence.'  [Citations.]
        The court does not, however, limit its review to the evidence that is
17      favorable to the respondent.  As *People v. Basset* [1968] 69 Cal.2d
        122, explained, 'our task . . . is twofold.  First, we must resolve the
18      issue in light of the *whole record*–i.e., the entire picture of the
        defendant put before the jury–and may not limit our appraisal to
19      isolated bits of evidence selected by the respondent.  Second, we
        must judge whether the evidence of each of the essential elements .
20      . . is *substantial*; it is not enough for the respondent simply to point
        to "some" evidence supporting the finding, for "Not every surface
21      conflict of evidence remains substantial in the light of the other
        facts."'  [Citation.]" (*People v. Johnson* (1980) 26 Cal.3d 557, 576-
22      577, italics in original.)

23         The elements of first degree murder are properly set forth in
        CALJIC No. 8.20.  (*People v. Lucero* (1988) 44 Cal.3d 1006,
24      1021.)  CALJIC No. 8.20 provides:

25         "All murder which is perpetrated by any kind of willful, deliberate
        and premeditated killing with express malice aforethought is
26      murder in the first degree.

"The word 'willful' as used in this instruction means intentional.

"The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.

"The word 'premeditated' means considered beforehand.

"If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill which was the result of deliberation and premeditation so that it must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree.

"The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated.  The time will vary with different individuals and under varying circumstances.

"The true test is not the duration of time, but rather the extent of reflection.  A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it include[s] an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder in the first degree.

"To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing, and the reasons for and against such a choice, and having in mind the consequences, he decides to and does kill."

The jury was instructed in this language.

In *People v. Anderson* (1968) 70 Cal.2d 15, the Supreme Court reviewed cases on first degree murder.  It found the type of evidence sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: "(1) facts about how and what the defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing–what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support inference that the killing was a result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of the killing was so particular and

exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2). [¶] Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Id.* at pp. 26-27, italics in original.)

Defendant contends the evidence in this case is insufficient to sustain a finding of premeditation and deliberation because there is no evidence of planning. Rather, the killing occurred with the gardener outside and the entire episode took at most 25 minutes. Defendant claims the motive is pure speculation. The manner of killing was a single shot from two feet off the ground. The gardener heard no cries for help. Defendant further argues his post-killing conduct cannot be relied upon to show premeditation.

The Attorney General contends the circumstantial evidence meets the *Anderson* guidelines. He argues turning up the television shows planning activity, "[t]he evidence of motive was very strong," and the manner of killing, following a beating, shows premeditation and deliberation.

"Unreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way. [Citation.]" (*People v. Thomas* (1992) 2 Cal.4th 489, 517.) "The *Anderson* guidelines are descriptive, not normative. [Citation.]" (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.)

In analyzing this case under the *Anderson* guidelines, both defendant and the Attorney General ignore the direct evidence of premeditation and deliberation on which the jury focused. On cross-examination, using defendant's testimony in the prior trial, the prosecutor forced defendant to admit he fired the gun intending to kill McClary. Further, he admitted he decided he had to shoot her during the struggle over the gun, before he had the weapon. The jury asked to have this portion of defendant's testimony reread, indicating, "We believe he said to himself that he knew he had to kill her." In fact, defendant testified, "right before I had pulled the gun away from her I was like, 'I've got to shoot.'" He then shot with the intent to kill her.

Although this evidence may not fit neatly within the *Anderson* framework, it is direct evidence that defendant thought about

1    killing McClary and intended to do so before he shot.  It indicates
     the killing was not a "rash impulse hastily executed."  (*People v.*
2    *Anderson*, *supra*, 70 Cal.2d at p. 27.)  Bolstering this evidence is
     defendant's post-killing conduct in attempting to cover up his
3    crime by planting a knife, breaking a window, and pulling down
     the victim's pants to suggest a motive of sexual assault.  While this
4    evidence alone cannot establish a cold, calculated decision to kill,
     it may be considered in realtion to the manner of killing.  (*People*
5    *v. Perez*, *supra*, 2 Cal.4th at p. 1128.)  While the beating of
     McClary is suggestive of rage, the evidence indicated it occurred
6    all over the house, with defendant following McClary from room
     to room to continue his attack.  Further, "premeditation and
7    deliberation can occur in a very short period of time. [Citation.]
     The test is not time, but reflection.  'Thoughts may follow each
8    other with great rapidity and cold, calculated judgment may be
     arrived at quickly. . . .' [Citation.]" (*People v. Boyd* (1987) 43
9    Cal.3d 333, 348.)

10   The record taken as a whole supports a finding that defendant
     decided to kill McClary before he got the gun and that his actions
11   were the result of cool deliberation rather than rash impulse.  This
     evidence is sufficient to support the verdict of first degree murder.

12

13   Slip Op. at 9-15.

14        The Due Process Clause of the Fourteenth Amendment "protects the accused against

15   conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

16   crime for with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  There is

17   sufficient evidence to support a conviction if, "after viewing the evidence in the light most

18   favorable to the prosecution, any rational trier of fact could have found the essential elements of

19   the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  "[T]he

20   dispositive question under *Jackson* is 'whether the record evidence could reasonably support a

21   finding of guilt beyond a reasonable doubt.'"  *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir.

22   2004) (quoting *Jackson*, 443 U.S. at 318).  A petitioner for writ of habeas corpus "faces a heavy

23   burden when challenging the sufficiency of the evidence used to obtain a state conviction on

24   federal due process grounds."  *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).

25   / / /

26   / / /

A federal habeas court determines the sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law.  *See Jackson*, 443 U.S. at 324 n. 16; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." (citations omitted)). Murder is defined by California Law as "the unlawful killing of a human being . . . with malice aforethought." *See* Cal. Penal Code § 187(a).  Murder in the first degree is defined as follows:

> All murder which is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed to primarily penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, or any action punishable under Section 206, 286, 288, 288a, or 289, or any murder which is perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death, is murder of the first degree.

Cal. Penal Code § 189.  "Deliberation refers to careful weighing of considerations in forming a course of action; premeditation means thought over in advance.  The process of premeditation and deliberation does not require any extended period of time.  The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." *People v. Koontz*, 27 Cal. 4th 1041, 1080, 46 P.3d 335, 119 Cal. Rptr. 2d 859 (2002) (internal citations and quotations omitted); *accord, People v. Halvorsen*, 42 Cal. 4th 379, 419, 165 P. 3d 512, 64 Cal. Rptr. 3d 721 (2007).  The processes can occur rapidly, even after an altercation is underway.  *People v. Mayfield*, 14 Cal. 4th 668, 767, 928 P. 2d 485, 60 Cal. Rptr. 2d 1(1997); *People v. Sanchez*, 12 Cal. 4th 1, 34, 906 P. 2d 1129, 47 Cal. Rptr. 2d 843 (1995) *abrogated on other grounds by People v. Doolin*, 45 Cal. 4th 390, 198 P. 3d 11, 87 Cal. Rptr. 3d 209 (2009).

/ / /

/ / /

1      In *Mayfield*, *supra*, the California Supreme Court upheld a conviction for first degree

2 murder where the defendant shot a police officer shortly after he grabbed the officer's gun from

3 the officer's hands.  *Mayfield* 14 Cal. 4th at 767.  The Court found that even though the

4 defendant had little time to act, his statement that "all [he] could think about was getting his gun

5 and shooting him so he couldn't arrest me" was sufficient to support a finding of premeditation

6 and deliberation under California law.  Thus, under California law, premeditation and

7 deliberation can be established when a defendant decides to kill someone in the midst of an

8 argument, so long as they have at least a moment to consider their actions.

9      In the present case, it was reasonable to conclude that Petitioner's testimony on cross-

10 examination provided the jury with sufficient evidence that Petitioner had determined to kill the

11 victim while they were fighting over the gun, before Petitioner had the opportunity to pull the

12 trigger.  The following colloquy ensued on cross-examination at Petitioner's retrial:

13          Q:    Now, did you think at all that – before you got the gun
14                  away from her, that you had to shoot her?

          A:    No.  Not until right before  – right before when we were
15                  wrestling over it, right when I – I got my hand on it.

16          Q:    Okay.  And you had your hands on it two or three seconds –

17          A:    No.

18          Q:    – before you –

19          A:    We were wrestling two or three seconds before I had got
20                  my hands on it, and pull the gun away.

          Q:    Okay.  Do you remember again testifying on cross-
21                  examination . . . in the last trial?

22                   All I remember when we were wrestling
                   with the gun, uh, at a certain time in my
23                   head right before I had pulled the gun away
                   from her I was like, "I've got to shoot."  I
24                   pulled the gun away and I just shot with, uh,
                   no time to think or nothing.  Just happened
25                   quick, real quick.

26          A:    Yes.

Q:    So you thought about it at least for a moment before you
      got the gun away, about "I have to shoot her"?

A:    Yes, right – right when I had got somewhere through there.

RT2 at 1157-58.  Thus, Petitioner's testimony shows that he decided to shoot the victim at least a

moment before he obtained sole possession of the gun.  Furthermore, Petitioner, an avid hunter,

was well aware that a shot to the head from such a close proximity was likely fatal, *Id.* at 1164,

showing he had the intent to kill.  *Mayfield* 14 Cal. 4th at 768.  While Petitioner only had a

moment to consider his actions before pulling the trigger, "[t]he process of premeditation and

deliberation does not require any extended period of time.  'The true test is not the duration of

time as much as it is the extent of the reflection.  Thoughts may follow each other with great

rapidity and cold, calculated judgment may be arrived at quickly. . . .'"  *Id.* (quoting *People v.

Thomas*, 25 Cal. 2d 880, 900, 156 P.2d 7 (1945)) (other citations omitted).

     While Petitioner's testimony, by itself, supports a reasonable conclusion that the evidence

was sufficient for first degree murder, other evidence adduced at Petitioner's trial also indicates

his actions were premeditated and deliberate.  The prosecution argued that Petitioner's rendition

of the events, his third or fourth version the story,[2] was yet another lie created to avoid liability

for his actions.  The evidence indicated that the noise from the television or radio was coming

from the house at a very loud volume, that the phone cord was pulled from the wall, and that the

door to the bedroom was kicked in.  The prosecution argued that Petitioner had turned the

volume up to cover the noise of his planned attack on the victim, that he had removed the phone

from the wall to prevent her from calling for help, and that he had kicked in the bedroom door

intent on killing the victim.  If the jury did not find Petitioner's testimony credible, these are all

---

        [2]     At first, Petitioner attempted to make it look like someone had broken into his
home while he was away and sexually assaulted and killed the victim.  After police interrogation,
Petitioner admitted that he had killed the victim but said that it was an accident.  Finally, at trial,
Petitioner admitted that he killed the victim but argued that it was under a heat of passion.  His
testimony regarding his state of mind throughout the argument between himself and the victim
changed significantly between the mistrial and the retrial.  *See, e.g.*, RT2 at 1229-39.

1   logical inferences from the evidence admitted at trial.

2       Petitioner has not met his heavy burden of establishing the insufficiency of the evidence.

3   As such, his claim should be denied.

4       8.  Claim XI

5       Lastly, in Claim XI, Petitioner asserts two purported errors in the trial court's instructions

6   to the jury which violated his right to due process.  First, Petitioner contends that the trial court

7   improperly gave an instruction regarding consciousness of guilt.  Second, Petitioner contends that

8   the trial court erred by refusing to give a related instruction suggested by Petitioner.  The last

9   reasoned state court decision with regard to these claims is the decision of the California Court of

10  Appeal on Petitioner's direct appeal.

11          Over defendant's objection, the trial court gave the standard
12          instruction on willfully false statements (CALJIC No. 2.03).  "If
         you find that before this trial defendant made a willfully false or
13          deliberately misleading statement concerning the crime for which
         he is now being tried, you may consider such statement as a
14          circumstance tending to prove a consciousness of guilt. [¶]
         However, such conduct is not sufficient by itself to prove guilt and
15          its weight and significance, if any, are matters for your
         determination."

16          The trial court also rejected a special instruction proposed by the
         defense which read:  "Evidence that the defendant attempted to
17          hide or cover up the killing by false or evasive statements made
         after the killing cannot be considered by you in determining
18          whether the killing was deliberate and premeditated."

19          Defendant contends the trial court violated due process by giving
         the first instruction and rejecting the second.  As defendant
20          recognizes, the California Supreme Court has found no due process
         violation in giving CALJIC 2.03 where the defendant's mental
21          state at the time of the killing was the only contested issue.
         (*People v. Nicolaus* (1991) 54 Cal.3d 551, 579.)  Further, the high
22          court has held there is no due process violation in failing to give a
         limiting instruction that defendant's deceptive or evasive behavior,
23          while it may indicate consciousness of guilt, is not probative of
         defendant's state of mind at the time the crime was committed.
24          (*People v. Jackson* (1996) 13 Cal.4th 1164, 1224.)

25  Slip Op. at 17-18.

26  / / /

A challenge to a jury instruction solely as an error of state law does not state a claim cognizable in a federal habeas corpus action. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See id.* at 72. Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *See id.* The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *See United States v. Frady*, 456 U.S. 152, 169 (1982). Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), which is whether the error had substantial and injurious effect or influence in determining the jury's verdict. *See, e.g.*, *Hedgpeth v. Pulido*, 555 U.S. 57 (2008) (per curiam).

In the present case, the Court of Appeal reasonably ruled on each of Petitioner's challenges to the jury instructions. Viewing the instructions as a whole, the members of the jury could not have inferred from the consciousness of guilt instruction, CALJIC 2.03, that they could find Petitioner guilty of first degree murder based on Petitioner's acts after the crime. With regard to the first degree murder charge, the jury was instructed with CALJIC 8.20. *See* Slip. Op. at 10-11. That instruction clearly and precisely defined the terms "premeditation" and "deliberation" for the jury.

> All murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder in the first degree.

> The word "willful" as used in this instruction means intentional.

> The word "deliberate" means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.

1

2

> The word "premeditated" means considered beforehand.
>
> If you find that the killing was *preceded and accompanied* by a clear, deliberate intent on the part of the defendant to kill which was the result of deliberation and premeditation so that it must have been formed upon *preexisting* reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder in the first degree. . . .

3

4

5

6   CALJIC 8.20 (emphasis added); *see* Slip Op. at 10-11; *People v. Lucero*, 44 Cal. 3d 1006, 1021,

7   750 P.2d 1342, 245 Cal.Rptr. 185 (1998) (CALJIC 8.20 properly states the elements of first

8   degree murder under California law).  As such, the jury was clearly instructed that a finding of

9   first degree murder must be based on Petitioner's actions and mental state preceding the murder.

10  A later instruction that inconsistent statements could be considered as consciousness of guilt did

11  not alter or render null the previous instruction regarding first degree murder.  Viewing the

12  instructions as a whole, the California Court of Appeal was reasonable in its determination that

13  the consciousness of guilt instruction did not violate Petitioner's right to due process.  Moreover,

14  because the given instructions accurately reflected the law it was unnecessary for the trial court to

15  include Petitioner's suggested instruction that consciousness of guilt was not probative of

16  Petitioner's mental state at the time of the crime.  The jury had already been instructed as to the

17  required findings for first degree murder in the given instructions.  It was reasonable for the

18  Court of Appeal to conclude that refusal to give Petitioner's suggested instruction did not violate

19  due process.

20      Petitioner additionally argues that CALJIC 2.03 is unconstitutional because it allows for

21  an impermissible inference.  "[I]n criminal cases, the ultimate test of any device's constitutional

22  validity in a given case remains constant:  the device must not undermine the factfinder's

23  responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a

24  reasonable doubt."  *County Court of Ulster County, N. Y. v. Allen*, 442 U.S. 140, 140 (1979)

25  (citing *In re Winship*, 397 U.S. at 364 and *Mullaney v. Wilbur*, 421 U.S. 684, 702-03 n. 31

26  (1975)).  Mandatory presumptions (whether conclusive or rebuttable) violate due process if they

1    relieve the state of the burden of persuasion on an element of an offense. *Francis v. Franklin*,

2    471 U.S. 307, 314 (1985); *Sandstrom v. Montana*, 442 U.S. 510, 523 (1979); *United States v.*

3    *U.S. Gypsum Co.*, 438 U.S. 422 (1978); *Patterson v. New York*, 432 U.S. 197, 210 (1977);

4    *Morissette v. United States*, 342 U.S. 246 (1952).

5           A permissive inference instruction, on the other hand, is constitutional "so long as it can

6    be said 'with substantial assurance' that the inferred fact is 'more likely than not to flow from the

7    proved fact on which it is made to depend.'" *United States v. Rubio-Villareal*, 967 F.2d 294, 296

8    (9th Cir. 1992) (en banc), (citing *Allen*, 442 U.S. at 166 n.28); *Schwendeman v. Wallenstein*, 971

9    F.2d 313, 316 (9th Cir. 1992); *see also Tot v. United States*, 319 U.S. 463, 467-68 (1943). As the

10   Supreme Court has held, "[a] presumption which would permit but not require the jury to assume

11   intent from an isolated fact would prejudge a conclusion which the jury should reach of its own

12   volition." *Morissette*, 342 U.S. at 275. Therefore, "where intent is a necessary element of the

13   crime, it is error for the court to instruct the jury that it may, but is not required to, infer the

14   requisite intent from an isolated fact. There can be no presumption as to intention which would

15   permit the jury to make an assumption which all the evidence considered together does not

16   logically establish." *Baker v. United States*, 310 F.2d 924, 930-31 (9th Cir. 1962);

17   Rubio-Villareal, 967 F.2d at 298-99.

18          Here, the instruction does not offend Supreme Court precedent. Indeed, recently, in *Bell*

19   *v. Small*, No. 09-17738 [WL 2836284] (9th Cir. July 19, 2011), the Ninth Circuit upheld

20   California's consciousness of guilt instruction as a permissible inference. While it is

21   impermissible for an instruction to offer a presumption from which the jury could infer the intent

22   element of the crime, the jury instruction in question in this case did not permit the jury to make

23   such a finding. The instruction did not expressly permit an inference with regard to Petitioner's

24   mental state; the instruction merely permitted the jury to infer consciousness of guilt, not intent,

25   from Petitioner's post-crime inconsistent statements. *See* CALJIC 2.03 ("If you find that before

26   this trial defendant made a willfully false or deliberately misleading statement concerning the

1  crime for which he is now being tried, you may consider such statement as a circumstance

2  tending to prove a consciousness of guilt. . . .").  In the same instruction, the jury was told that

3  "such conduct is not sufficient by itself to prove guilt."  *Id.*  As such, the jury was not instructed

4  that they could infer Petitioner's mental state at the time the crime was committed from his

5  inconsistent statements after the killing.  As discussed above, the jury was properly instructed as

6  to what must be proved to sustain a conviction for first degree murder in a separate instruction.

7  Petitioner also argues that the instruction was improper because the only issue before the

8  jury was Petitioner's mental state and consciousness of guilt is irrelevant to that inquiry.

9  Petitioner's argument is misguided.  While it may be true that the only issue the defense chose to

10  contest was that of Petitioner's mental state, the burden remains on the government to prove each

11  and every element of the offense beyond a reasonable doubt.  *In re Winship*, 397 U.S. at 364.

12  Petitioner is not entitled to relief on his final claim.

13  VI.  CONCLUSION

14  Accordingly, IT IS HEREBY ORDERED that:

15  1.      Petitioner's request for an evidentiary hearing is DENIED.

16  2.      Petitioner's request for additional discovery is DENIED.

17  For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that the petition for

18  writ of habeas corpus be DENIED.

19  These findings and recommendations are submitted to the United States District Judge

20  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

21  after being served with these findings and recommendations, any party may file written objections

22  with the court and serve a copy on all parties.  Such a document should be captioned "Objections

23  to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be

24  served and filed within seven days after service of the objections.  The parties are advised that

25  failure to file objections within the specified time may waive the right to appeal the District

26  Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file,

1   Petitioner may address whether a certificate of appealability should issue in the event he elects to

2   file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254

3   Cases (the district court must issue or deny a certificate of appealability when it enters a final

4   order adverse to the applicant).

5   DATED:  September 7, 2011

6

7

8   _____

9   TIMOTHY J BOMMER
    UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26